ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL VI

| SAMUEL GALÁN GALÁN<br><br>Parte Apelante<br><br><br>v.<br><br><br>VPH MOTOR CORPORATION H/N/C TRIANGLE DEALERS, TRIANGLE DEALERS<br><br>Parte Apelada | TA2025AP00522 | *Apelación,* procedente del Tribunal de Primera Instancia, Sala Superior de Mayagüez<br><br>Caso Núm.: MZ2024CV00787<br><br>Sala: 206<br><br>Sobre: Despido Injustificado (Ley núm. 80), Procedimiento Sumario bajo Ley núm. 2 |

Panel integrado por su presidente, el Juez Rivera Colón, el Juez Monge Gómez y la Jueza Prats Palerm.

Monge Gómez, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 17 de noviembre de 2025.

Compareció ante este Tribunal la parte apelante, Samuel Galán Nieves (en adelante, el "señor Galán Nieves" o "Apelante"), mediante recurso de apelación presentado el 7 de noviembre de 2025. Nos solicitó la revocación de la *Sentencia* emitida y notificada por el Tribunal de Primera Instancia, Sala Superior de Mayagüez (en adelante, el "TPI"), el 28 de octubre de 2025. A través del referido dictamen, el TPI declaró "Ha Lugar" la "**Moción de Sentencia Sumaria**" presentada por VPH Oeste, LLC h/n/c Triange Dealers del Oeste (en adelante, "VPH Motor" o "Apelado").

Por los fundamentos que expondremos a continuación, *confirmamos* la *Sentencia* apelada.

**I.**

Los hechos del presente caso se originaron con la presentación de una "**Querella**" por parte del señor Galán Nieves en contra de VPH Motor sobre despido injustificado al amparo del procedimiento sumario dispuesto en la Ley Núm. 2 de 17 de octubre de 1961, según enmendada, mejor

conocida como la "Ley de Procedimiento Sumario de Reclamaciones Laborables", 32 LPRA sec. 3118 *et seq*. Mediante la misma, el señor Galán Nieves expresó que laboró como jefe de taller en el área de servicio al cliente de VPH Motor por espacio de veinte (20) años, específicamente desde el 20 de mayo de 2003 hasta el 16 de abril de 2024. Destacó que en su puesto percibía un salario bruto de $1,528.99 semanales y que trabajaba, como mínimo, cuarenta (40) horas semanales. Sostuvo que el 16 de abril de 2024 fue despedido de su empleo arbitrariamente y sin justa causa. En vista de lo anterior, le solicitó al Tribunal que le ordenara al Apelado a satisfacer las siguientes sumas: (1) $135,667.38 por concepto de mesada y (2) $33,916.85 por concepto de honorarios de abogado. Posteriormente, el señor Galán Nieves presentó una "**Querella Enmendada**" mediante la cual aclaró que VPH Motor Corporation y VPH Oeste, LLC. era su patrono al momento del despido

Así las cosas, VPH Motor presentó su "**Contestación a Querella**" a través de la cual negó la mayoría de las afirmaciones expuestas en su contra y argumentó que el despido del Apelante fue totalmente justificado y en cumplimiento con la Ley Núm. 80 de 30 de mayo de 1976, según enmendada, mejor conocida como "Ley sobre Despidos Injustificados" (en adelante, "Ley Núm. 80-1976"), la Ley Núm. 90-2020, según enmendada, mejor conocida como la "Ley para Prohibir y Prevenir el Acoso Laboral en Puerto Rico", las normas de conducta de VPH Motor y el historial disciplinario del señor Galán Nieves. Especificó que el referido despido respondió a una investigación independiente que reveló que el Apelante incurrió en conducta impropia, seria y grave, en clara violación a la política de acoso laboral de la empresa. Destacó, además, que las actuaciones del señor Galán Nieves fueron de tal severidad que hubiese sido irresponsable por parte de VPH Motor esperar una posible repetición para proceder con su despido. Así pues, le solicitó al TPI que declarara "No Ha Lugar" la "**Querella**" instada en su contra.

Superadas múltiples incidencias procesales impertinentes a la controversia de autos, el 30 de junio de 2025, VPH Motor presentó una

"**Moción de Sentencia Sumaria**". A través de dicho escrito, argumentó que no existían controversias sobre hechos medulares y pertinentes del caso y, por tanto, procedía su disposición por la vía sumaria. En particular, afirmó que el señor Galán Nieves actuó de manera hostil y agredió físicamente al Sr. Efrén Molina Pérez (en adelante, el "señor Molina Pérez") en el área de trabajo, durante horas laborables frente a otros empleados. También expresó que la decisión de destituir al Apelante se basó en los resultados de una investigación exhaustiva que reveló violaciones serias y crasas a sus deberes y responsabilidades como jefe de taller. Resaltó, además, que no era la primera vez que el señor Galán Nieves mostraba conducta agresiva hacia un compañero. Por último, precisó que la política disciplinaria de VPH Motor respecto a actos de hostigamiento o agresión no puede considerarse irrazonable.

En reacción a ello, el 1 de septiembre de 2025, el señor Galán Nieves presentó su "**Moción en Oposición a Solicitud de Sentencia Sumaria**" (en adelante, "Oposición") en la cual planteó que existen controversias sobre hechos materiales que impedían la disposición sumaria del caso. Asimismo, argumentó que el informe elaborado por la Lcda. Sonia Santana (en adelante, "Lcda. Santana") estaba fundamentado en entrevistas que constituían prueba de referencia. Manifestó que, en los más de veinte (20) años que el señor Galán Nieves trabajó para el Apelado, solo recibió dos amonestaciones, a saber: (1) una en el año 2008 y (2) otra en el año 2012. Alegó que siempre cumplió con las exigencias de su puesto incluyendo la producción requerida, nunca fue evaluado negativamente y, de hecho, fue ascendido. A tono con lo anterior, le peticionó al Tribunal que declarara "No Ha Lugar" la "**Moción de Sentencia Sumaria**" presentada por VPH Motor.

Más adelante, el 23 de septiembre de 2025, VPH Motor presentó su "**Réplica a Moción en Oposición a Solicitud de Sentencia Sumaria**" (en adelante, "Réplica") mediante la cual reiteró su postura y señaló que el Apelante sometió una declaración jurada que resultaba incompatible con su testimonio previo en la deposición, sin ofrecer explicación alguna para

justificar dichas discrepancias. Igualmente, alegó que el señor Galán Nieves no cumplió con los requisitos formales y sustantivos impuestos por la Regla 36.3 de Procedimiento Civil, 32 LPRA, Ap. V, R. 36.3, para oponerse válidamente a la "**Moción de Sentencia Sumaria**". Añadió que el informe de investigación constituía un récord de negocio admisible y que las declaraciones juradas anejadas a la "**Moción de Sentencia Sumaria**" no son prueba de referencia inadmisible, sino prueba directa que el Apelante tuvo amplia oportunidad de impugnar en el descubrimiento de prueba, pero decidió no hacerlo. En consonancia con lo anterior, le solicitó al Tribunal que desestimara, con perjuicio, las reclamaciones presentadas en su contra.

Finalmente, y tras la presentación de una "**Dúplica a Moción**" por parte del señor Galán Nieves, el 28 de octubre de 2025, el TPI dictó *Sentencia* en la que concluyó que no existían controversias sobre hechos materiales y pertinentes que impedían resolver el caso por la vía sumaria, y, en consecuencia, declaró "Ha Lugar" la "**Moción de Sentencia Sumaria**". En consonancia con lo anterior, desestimó, con perjuicio, la "**Querella Enmendada**".

Insatisfecho con lo anteriormente resuelto, el Apelante compareció ante este Tribunal mediante el recurso de epígrafe y le imputó al foro primario la comisión de los siguientes errores:

> Erró el TPI al dictar sentencia sumaria, cuando existe controversia sustancial de hechos materiales, específicamente, cuando hay controversia sobre cuál fue el último patrono y cuál de ellos fue el que despidió al Querellante.
>
> Erró el TPI al dictar sentencia sumaria, cuando existe controversia sustancial de hechos materiales, específicamente, en cuanto a la aplicación y cumplimiento con las disposiciones de la Ley 90-2020.
>
> Erró el TPI al dictar sentencia sumaria, cuando existe controversia sustancial de hechos materiales, específicamente, en cuanto a alegada agresión cometida por el querellante.
>
> Erró el TPI al dictar sentencia sumaria, cuando existe controversia sustancial de hechos materiales, cuando el patrono querellado no cumplió con la preservación de evidencia relacionada al caso.

El 17 de noviembre de 2025, VPH Motor presentó su "**Alegato en Oposición de la Parte Apelada**"

Con el beneficio de la comparecencia de ambas partes procedemos a resolver.

**II.**

**A.**

El propósito de las Reglas de Procedimiento Civil es proveerles a las partes que acuden a un tribunal una "solución justa, rápida y económica de todo procedimiento". Batista Valentín v. Sucn. Batista Valentín, 216 DPR ___; 2025 TSPR 93. Así, la Regla 36 del mencionado cuerpo procesal atiende lo referente al mecanismo de sentencia sumaria. A la luz de sus disposiciones, se dictará sentencia si de "las alegaciones, deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas si las hay, u otra evidencia demuestran que no hay controversia real sustancial en cuanto a algún hecho esencial y pertinente, y que como cuestión de derecho el tribunal debe dictar la sentencia sumaria a favor de la parte promovente". Regla 36.3 de Procedimiento Civil, 32 LPRA, Ap. V, R. 36.3; Negrón Castro y otros v. Soler Bernardini y otros, 216 DPR ____ (2025); 2025 TSPR 96.

En ese sentido, se considera un hecho material o esencial, "aquel que pueda afectar el resultado de la reclamación de acuerdo con el derecho sustantivo aplicable". Oriental Bank v. Caballero García, 212 DPR 671, 679 (2023). Cabe señalar que el juzgador no está limitado a los hechos o documentos que se produzcan en la solicitud, sino que puede tomar en consideración todos los documentos que obren en el expediente del tribunal. S.L.G. Szendrey-Ramos v. Consejo Titulares, 184 DPR 133, 167 (2011).

Solamente se dictará sentencia sumaria en casos en los cuales el tribunal cuente con la verdad de todos los hechos necesarios para resolver la controversia y surja claramente que la parte promovida por el recurso no prevalecerá. Oriental Bank v. Caballero García, *supra*, pág. 678. Sin embargo, el tribunal no podrá dictar sentencia sumaria cuando: (1) existan

hechos materiales y esenciales controvertidos; (2) haya alegaciones afirmativas en la Demanda que no han sido refutadas; (3) surja de los propios documentos que acompañan la moción una controversia real sobre algún hecho material; o (4) la moción no procede como cuestión de derecho. S.L.G. Szendrey-Ramos v. Consejo de Titulares, *supra*, pág. 168. Para prevalecer, el promovente de este recurso debe presentar una moción fundamentada en declaraciones juradas o en cualquier evidencia que demuestre la inexistencia de una controversia sustancial de hechos materiales sobre la totalidad o parte de la reclamación. Oriental Bank v. Caballero García, *supra*, pág. 678.

Por su parte, la parte promovida por una moción de sentencia sumaria debe señalar y refutar los hechos materiales que entiende están en controversia y que son constitutivos de la causa de acción del demandante. Rosado Reyes v. Global Healthcare, 205 DPR 796, 808 (2020); Oriental Bank v. Perapi et al., 192 DPR 7, 25-26 (2014). Así, la parte que se opone a que se dicte sentencia sumaria en su contra debe controvertir la prueba presentada y no cruzarse de brazos. ELA v. Cole, 164 DPR 608, 626 (2005). No puede descansar en meras afirmaciones contenidas en sus alegaciones ni tomar una actitud pasiva, sino que está obligada a presentar contradeclaraciones juradas y/o contradocumentos que pongan en controversia los hechos presentados por el promovente. Oriental Bank v. Caballero García, *supra*, pág. 8; Roldán Flores v. M. Cuebas *et al.*, 199 DPR 664, 677 (2018).

Adicionalmente, en León Torres v. Rivera Lebrón, 204 DPR 20, 47 (2020), el Tribunal Supremo resolvió que ninguna de las partes en un pleito puede enmendar sus alegaciones a través de la presentación de una solicitud de sentencia sumaria o su oposición. Así que, según lo expresa el propio tribunal, "la parte que se opone a una solicitud de sentencia sumaria no puede traer en su oposición, de manera colateral, defensas o reclamaciones nuevas ajenas a los hechos consignados en sus alegaciones, según consten en el expediente del tribunal al momento en que se sometió la moción dispositiva en cuestión". Íd., pág. 54.

Según las directrices pautadas por nuestro más alto foro, una vez se presenta la solicitud de sentencia sumaria y su oposición, el tribunal deberá: (1) analizar todos los documentos incluidos en ambas mociones y aquellos que obren en el expediente del tribunal; y (2) determinar si la parte opositora controvirtió algún hecho material o si hay alegaciones en la demanda que no han sido refutadas en forma alguna por los documentos. Abrams Rivera v. ELA, DTOP y otros, 178 DPR 914, 932 (2010).

Al examinar la procedencia de una moción que solicita disponer de un caso sumariamente, el tribunal no tiene que sopesar la evidencia y determinar la veracidad de la materia, sino que su función estriba en determinar la existencia o no de una controversia genuina, la cual amerite ser dilucidada en un juicio plenario. JADM v. Centro Comercial Plaza Carolina, 132 DPR 785, 802-803 (1983). Además de que "[t]oda inferencia razonable que se realice a base de los hechos y documentos presentados, en apoyo y en oposición a la solicitud de que se dicte sentencia sumariamente, debe tomarse desde el punto de vista más favorable al que se opone a ésta". ELA v. Cole, 164 DPR 608, 626 (2005).

En el caso de revisar la determinación del TPI respecto a una sentencia sumaria, este foro apelativo se encuentra en la misma posición que el foro de instancia para evaluar su procedencia. Rivera Matos *et al.* v. Triple-S *et al.*, 204 DPR 1010, 1025 (2020); Meléndez González *et al.* v. M. Cuebas, 193 DPR 100, 118 (2015). La revisión que realice el foro apelativo deberá ser *de novo* y estará limitada a solamente adjudicar los documentos presentados en el foro apelado. Vera v. Dr. Bravo, 161 DPR 308, 335 (2004)*.* De modo que las partes que recurren a un foro apelativo no pueden litigar asuntos que no fueron traídos a la atención del foro de instancia. Íd. En adición a esta limitación, se ha aclarado que al foro apelativo le está vedado adjudicar los hechos materiales esenciales en disputa, porque dicha tarea le corresponde al foro de primera instancia. Íd. págs. 334-335.

En Meléndez González *et al.* v. M. Cuebas, *supra*, nuestro más Alto Foro delimitó los pasos del proceso a seguir para la revisión de la sentencia sumaria por parte de este foro revisor, el cual consiste de: (1) examinar *de*

*novo* el expediente y aplicar los criterios que la Regla 36 de Procedimiento Civil, *supra*, y la jurisprudencia le exigen al foro primario; (2) revisar que tanto la moción de sentencia sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla 36, *supra*; (3) revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, 32 LPRA Ap. V, R. 36.4, de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles son incontrovertibles; (4) y, de encontrar que los hechos materiales realmente son incontrovertidos, debe proceder a revisar *de novo* si el Tribunal de Primera Instancia aplicó correctamente el derecho a la controversia. Íd., págs. 118-119.

Conviene desde ahora destacar que el Tribunal Supremo también ha expresado que es desaconsejable utilizar la moción de sentencia sumaria en casos en donde existe controversia sobre elementos subjetivos, de intención, propósitos mentales o negligencia. Ramos Pérez v. Univisión de P.R, 178 DPR 200, 2019 (2010); Carpets & Rugs v. Tropical Reps, 175 DPR 615, 638 (2009). No obstante, "cuando de los documentos a ser considerados en la solicitud de sentencia sumaria surge que no existe controversia en cuanto a los hechos materiales" nada impide que se utilice la sentencia sumaria en casos donde existen elementos subjetivos o de intención. Ramos Pérez v. Univisión de P.R, *supra*, pág. 219.

**B.**

Con el fin de proteger el derecho de los empleados a la tenencia de su empleo, la Asamblea Legislativa aprobó la Ley Núm. 80 de 30 de mayo de 1976, según enmendada, conocida como la "Ley Sobre Despidos Injustificados", 29 LPRA sec. 185a *et seq.* En nuestro sistema jurídico, el contrato de servicios que concretiza una relación obrero-patronal se constituye como el medio principal de sustento para los empleados y sus dependientes. Díaz v. Wyndham Hotel Corp., 155 DPR 364, 374 (2001). Debido a ello, existe un interés estatal apremiante para reglamentar las relaciones obrero-patronales, de forma tal que las mismas se enmarquen en una política pública enfocada en salvaguardar los

derechos de los trabajadores. Íd. De conformidad con lo anterior, se incorporó en la Ley Núm. 80, *supra*, el requisito de "justa causa" como medida limitativa en toda causa de acción por despido. Por tanto, nuestra jurisprudencia ha establecido que este estatuto siempre debe ser interpretado de la forma más liberal y favorable al empleado. Jusino *et als.* v. Walgreens, 155 DPR 560, 571 (2001).

Así pues, "todo empleado de comercio, industria o cualquier otro negocio o sitio de empleo, que sea contratado sin tiempo determinado y trabaje mediante remuneración de alguna clase, tendrá derecho a recibir de su patrono una indemnización cuando sea despedido de su empleo sin que haya mediado justa causa". Ortiz Ortiz v. Medtronic, *supra*, pág. 771. Para ser acreedor del remedio y de los beneficios que instituye la Ley Núm. 80, *supra*, el empleado separado de su cargo debe cumplir con los siguientes requisitos: (1) la existencia de una relación obrero-patronal remunerada; (2) que el empleado haya sido contratado por tiempo indeterminado; y (3) que el empleado haya sido despedido sin que medie justa causa. C. Zeno Santiago y otros, Tratado de Derecho del Trabajo, San Juan, Puerto Rico, Publicaciones JTS, 2003, T. I, pág. 98 (énfasis suplido).

Nótese que nuestro ordenamiento jurídico cobija el poder de dirección empresarial, **al reconocerles a los patronos el derecho de despedir a sus empleados, por cualquier razón no discriminatoria**. Díaz v. Wyndham Hotel Corp., *supra*, pág. 377. Sobre el particular, cabe destacar que las circunstancias que contempla el estatuto en cuanto a lo que se entiende como causa que justifique el despido no son taxativas y que constituye justa causa para el despido aquella que está vinculada a la ordenada marcha y normal funcionamiento de una empresa. Srio. del Trabajo v. G.P. Inds., Inc., 153 DPR 223, 243 (2001).

En específico, la Ley Núm. 80, *supra*, define justa causa como "aquella que no esté motivada por razones legalmente prohibidas y que no sea producto del mero capricho del patrono". 29 LPRA sec. 185b. Específicamente, el estatuto establece que se entenderá como justa causa

para un despido aquellas razones que afecten el buen y normal funcionamiento de un establecimiento, incluyendo que el empleado incumpla con normas y estándares de seguridad del patrono. Íd.

Conforme al poder de dirección empresarial y para garantizar el buen funcionamiento de la empresa, nuestro ordenamiento permite que los patronos adopten normas razonables y los reglamentos que entiendan sean necesarios, y en las que se definan las faltas que, por su gravedad, podrían acarrear el despido como sanción. SLG Torres-Mantundan v. Centro Patología, 193 DPR 920, 930-931 (2015); *véase además*, Art. 2 de la Ley Núm. 80, 29 LPRA sec. 185b. Así pues, adicional a las circunstancias establecidas en ley, la violación a las normas o reglamentos adoptados podrían ser motivo justificado para el despido de un trabajador si el patrono prueba que: (1) la violación a los reglamentos es reiterada; (2) las reglas y los reglamentos son razonables; (3) se han suministrado oportunamente copia escrita de estas reglas y estos reglamentos al trabajador, y (4) el despido del empleado no se haga por mero capricho del patrono o sin una razón relacionada con el buen y normal funcionamiento del establecimiento. Feliciano Martes v. Sheraton, 182 DPR 368, 381-382 (2011).

Por último, y de particular importancia a los hechos del presente caso, nuestro ordenamiento jurídico no favorece el despido como medida ante una primera ofensa o incumplimiento. SLG Torres-Matundan v. Centro Patología, 193 DPR 920, 931 (2015). Esto es, como norma general, un acto aislado o conducta impropia no justifica el despido de un empleado. Íd. pág. 931. Sin embargo, esta norma no es absoluta. Así pues, nuestro más alto foro judicial ha expresado que la Ley Núm. 80, *supra,* no excluye de la sanción o despido en primera ofensa, aquella "cuya intensidad de agravio en protección de la buena marcha de la empresa y la seguridad de las personas que allí laboran". Íd. Por tal razón, aunque la ley no favorece el despido como castigo a la primera ofensa, esto podría ser visto como válido si la acción u omisión pone en riesgo la seguridad, el orden o la eficacia que constituyen el funcionamiento del negocio. Rivera v. Pan Pepin, 161

DPR 681, 690 (2004). Dicho de otro modo, el patrono tiene el peso de demostrar que:

> La falta o acto aislado que dé lugar [a]l despido del empleado en primera ofensa ha de ser de tal seriedad o naturaleza que revele una actitud o un detalle de su carácter, tan lesivo a la paz y al buen orden de la empresa, que constituiría una imprudencia esperar [a que se repita, para entonces proceder con el despido]. Feliciano Martes v. Sheraton, 182 DPR 368, 383 (2011) (corchetes en el original).

Atinente a la controversia que nos ocupa, en Torres Solano v. P.R.T.C., 127 DPR 499 (1990), nuestro Tribunal Supremo validó el reglamento de personal de la *Puerto Rico Telephone Company* que disponía para el despido de un empleado que hubiera efectuado conducta constitutiva de agresión. A pesar de que dicho caso fue resuelto en el contexto de empleados públicos, en SLG Torres-Mantundan v. Centro Patología, *supra*, el alto foro judicial extendió el mismo principio a la norma expuesta en Torres Solano v. P.R.T.C., *supra*, y concluyó que en la empresa privada el efecto directo de una agresión en el empleo es "la humillación y el menosprecio de la dignidad humana del agredido y la interrupción de las labores y el funcionamiento habitual de la agencia". SLG Torres-Mantundan v. Centro Patología, *supra*, pág. 932. Por tanto, dicho foro concluyó que el despido, como primera ofensa, a consecuencia de una agresión en el empleo es justificado. Íd. Ello, toda vez que "*[d]espués de todo, la dignidad y seguridad de un empleado público tiene el mismo valor que la de un empleado de la empresa privada*". Íd. (énfasis en el original).

> **La ley no requiere que un patrono espere a que una empleada que amenazó y agredió a una compañera durante horas laborables y en los predios de la empresa, cometa una segunda o tercera amenaza o agresión para que pueda ser cesanteada conforme a la Ley Núm. 80**. *Un patrono no tiene por qué permitir un ambiente de trabajo donde los empleados estén impedidos de trabajar en paz y con la tranquilidad de que no van a ser agredidos ni amenazados por sus compañeros.* Íd., pág. 935 (énfasis suplido y en el original).

**III.**

En el presente caso, el señor Galán Nieves nos solicitó la revocación de la *Sentencia* en la que se declaró "Ha Lugar" la "**Moción de Sentencia Sumaria**" presentada por VPH Motor.

Los señalamientos de error esgrimidos están íntimamente relacionados, por lo que se tratarán de forma conjunta en la discusión. En síntesis, el Apelante sostiene que el TPI erró al dictar sentencia sumaria cuando existen controversias sustanciales de hechos materiales respecto a los siguientes asuntos: (1) cuál fue el último patrono del señor Galán Nieves y cuál de ellos fue el que lo despidió; (2) si se cumplieron con las disposiciones de la Ley Núm. 90-2020, según enmendada, mejor conocida como la "Ley para Prohibir y Prevenir el Acoso Laboral en Puerto Rico"; (3) la alegada agresión cometida por el Apelante; y (4) la preservación de evidencia relacionada al caso. Veamos.

Según adelantáramos, al momento de revisar una determinación del foro de instancia respecto a una solicitud de sentencia sumaria, estamos llamados a realizar una revisión de *novo* y limitarnos únicamente a adjudicar las controversias con los documentos que obran en el expediente ante el foro *a quo*. Del análisis de la prueba que se presentó ante el TPI, determinamos que sobre los siguientes hechos esenciales y pertinentes no existe controversia:

1. El señor Galán Nieves comenzó a trabajar para VPH Motor el 20 de mayo de 2003 mediante un contrato de empleo probatorio ocupando el puesto de técnico automotriz.

2. Desde el año 2013 hasta la fecha de su despido el Apelante ocupó el puesto de jefe de taller.

3. Al momento de su despido, el supervisor directo del señor Galán Nieves era el Sr. Tomás Rosas (en adelante, el "señor Rosas".

4. Como jefe de taller, el Apelante supervisaba directamente a los técnicos automotrices, a los empleados del área de lavadero y a los empleados de planta física y de manera indirecta a los asesores de servicio asistiéndolos con situaciones con clientes o labores técnicas y distribución del trabajo en la mañana.

5. Las funciones de un técnico automotriz incluyen, entre otras: (1) recibir e inspeccionar la unidad; (2) verificar los problemas presentados por el cliente; (3) reparar la unidad en tiempo razonable; (4) pedir piezas en el departamento de piezas para el cliente; e (5) instalar piezas.

6. Las funciones de un asesor de servicio incluyen recibir al cliente, abrir la orden de trabajo y verificar que las quejas del cliente fueran las correctas.

7. A cada técnico automotriz se le asigna de forma fija un espacio de trabajo, conocido como "pino", donde ubican su caja de herramientas para atender las unidades.

8. La Sra. Myrna López (en adelante, la "señora López") es asesora de Recursos Humanos de VPH Motor y tiene, entre otras, las siguientes responsabilidades: (1) evaluar situaciones de personal; (2) brindar apoyo a los gerentes y supervisores en torno a aspectos de personal; (3) participar del proceso de toma de decisiones sobre despidos de empleados; (4) participar en investigaciones que sean necesarias ante reclamaciones de los empleados y contratar al personal necesario para hacer las investigaciones cuando estime procedente; (5) custodiar los expedientes de personal de los empleados y exempleados de la empresa; entre otros servicios asociados a aspectos de recursos humanos.

9. El Sr. Carlos Vaillant es el dueño de VPH Motor.

10. Como jefe de taller, el Apelante tenía, entre otras, las siguientes responsabilidades: (1) asegurar el funcionamiento completo del taller de reparaciones y servicios; (2) brindar apoyo y asistencia diaria a los técnicos ante cualquier situación que lo requiriera; (3) evitar otorgar trato preferencial a familiares o amistades por encima de los clientes; (4) supervisar al personal; (5) atender a los asesores de servicio; (6) evaluar las operaciones; (7) tratar con respeto a todos los empleados y visitantes del concesionario; (8) cumplir con las disposiciones del Manual del Empleado; (9) abstenerse de incurrir en conductas que constituyan acoso u hostigamiento; (9) no agredir física ni verbalmente a los empleados; y (10) evitar el uso de lenguaje soez en el área de trabajo.

11. El señor Galán Nieves acusó recibo del Manual del Empleado de VPH Motor y certificó que lo leyó cuidadosamente.

12. Las "Normas de Trabajo" del Manual del Empleado requieren que los empleados se comporten de forma profesional y de acuerdo con normas de trabajo y procedimientos establecidos en la Compañía.

13. Las "Normas de Trabajo" del Manual del Empleado disponen ejemplos de violaciones que podrían redundar en acción disciplinaria, incluyendo la terminación de empleo.

14. Las "Normas de Trabajo" del Manual del Empleado prohíben la comisión de la siguiente conducta: (1) rudeza o comportamiento no profesional hacia el cliente, o cualquier persona en contacto con Triangle Dealer; (2) peleas o provocaciones que induzcan a pelea; (3) hostigamiento de cualquier tipo, (4) **realizar actos o prácticas inseguras que pongan en peligro la vida o propiedad**, (5) posesión de armas de fuego o cualquier arma peligrosa en cualquier lugar propiedad de Triangle Dealers o en cualquier vehículo de empleado, (6) desempeño insatisfactorio en el trabajo, (7) ausencias o tardanzas excesivas, entre otros.

15. El señor Galán Nieves reconoció que, si la empresa determinaba que él había incurrido en conducta de agresión física o verbal hacia un empleado, la medida disciplinaria procedente según el Manual del Empleado y las amonestaciones impartidas, era el despido.

16. El 26 de enero de 2024, el señor Molina Pérez presentó en la empresa una queja escrita por un incidente relacionado con el señor Galán Nieves.

17. El señor Molina Pérez informó en su escrito que tuvo un altercado con el señor Galán Nieves, quien reaccionó de forma agresiva luego de una discusión sobre asignación de trabajo. Alegó que el Apelante lo empujó y lo enfrentó de forma intimidante, incluso provocándolo a pelear. Añadió que mencionó la existencia de cámaras y que se sintió intimidado, en especial porque el Apelante suele portar un arma y alardear de ello. Señaló que después del suceso, acudió a su supervisor, el señor Rosas y junto a la empleada Franchesca Ramos (en adelante, la "señora Ramos") expuso lo ocurrido. Expresó que el señor Rosas le instruyó retirarse y preparar un informe escrito. El señor Molina Pérez también le comunicó la situación a la señora Andújar y expresó su temor por su estabilidad laboral y por tener que regresar a un ambiente que percibe como hostil y amenazante para su integridad física y emocional.

18. El 26 de enero de 2024, el Apelante presentó una "**Narrativa de Suceso**" indicando que, a las 9:28 a.m., preguntó al señor Molina Pérez por una unidad que debía haberse movido el día anterior, y el señor Molina Pérez reaccionó de forma agitada y se negó. Expresó que posteriormente, la señora Ramos le dijo que el señor Molina Pérez estaba renunciando; al decírselo directamente, el señor Molina Pérez se le acercó molesto y lo llamó mentiroso. El Apelante expresó que le pidió que se alejara y que debía salir del área. Luego informó a su supervisor, quien le indicó que el señor Molina Pérez presentó una queja alegando falta de respeto.

19. A raíz del incidente ocurrido y la queja presentada por el señor Molina Pérez, el Apelante fue suspendido como una medida preventiva temporera pendiente una investigación sobre los eventos del 26 de enero de 2024.

20. VPH Motor llevó a cabo una investigación como resultado de la queja presentada por el señor Molina Perez el 26 de abril de 2024.

21. La señora López contrató a la Lcda. Santana en calidad de evaluadora independiente con el propósito de investigar la queja escrita presentada por el señor Molina Pérez y que rindiera un informe con sus hallazgos, determinaciones, conclusiones y recomendaciones.

22. La Lcda. Santana rindió un "**Informe de Evaluación Independiente**" con fecha de 2 de abril de 2024, que incluye las gestiones y declaración de las entrevistas realizadas, así como sus determinaciones de hechos y conclusiones y recomendaciones de la investigación realizada.

23. El Informe contiene un total de cuarenta y seis (46) folios y diecisiete (17) anejos que constan de documentos que fueron provistos por la señora López durante la investigación.

24. Como parte de las entrevistas realizadas, la Lcda. Santana redactó hojas de entrevista con el detalle de lo declarado por los entrevistados durante la investigación.

25. Dichas hojas de entrevista fueron firmadas por la Lcda. Santana y revisadas y suscritas por los entrevistados certificando que revisaron su contenido y que este refleja fielmente la información brindada a la entrevistadora.

26. La Lcda. Santana entrevistó de manera individual y presencial a un total de cuarenta y un (41) personas, incluyendo al señor Molina Pérez y al Sr. Galán Nieves.

27. Al concluir el informe, la Lcda. Santana lo entregó, junto con sus diecisiete (17) anejos, a la señora López.

28. Como investigadora independiente, la Lcda. Santana no tuvo inherencia en la decisión del despido tomada por VPH Motor a base de los hallazgos de la investigación.

29. Del informe y la hoja de entrevista se desprende que el señor Molina Nieves, técnico por alrededor de dos años y medio, explicó que el 26 de enero de 2024 Samuel Galán le ordenó mover una unidad desmontada, pero él le informó que estaba terminando otro trabajo. Al día siguiente, mientras atendía una tarea urgente asignada por su *team leader*, Galán Nieves le cuestionó nuevamente por qué no había removido la unidad, a lo que señor Molina Pérez respondió que había otros pinos disponibles. Indicó que Galán Nieves adoptó una actitud hostil, lo confrontó y lo acusó de mentir, lo que llevó al señor Molina Pérez a decidir recoger sus pertenencias y entregar sus trabajos pendientes. Señaló que escuchó a Galán Nieves decir "el portón está abierto, que se vaya pal carajo" y negar instrucciones previas, lo cual él contradijo. Afirmó que Galán Nieves se mostró agresivo e intimidante y que incluso mencionó las cámaras del área. Finalmente, el señor Molina Pérez acudió a la oficina del señor Rosas, quien le indicó que se retirara a su casa y redactara un informe sobre lo ocurrido.

30. Del informe y la hoja de entrevista se desprende que el señor Galán Nieves afirmó que su relato escrito sobre el incidente del 26 de enero de 2024 es una descripción fiel de lo ocurrido. Indicó que, esa misma tarde, el gerente general, el Sr. Jorge Escudero (en adelante, el "señor Escudero"), le informó inicialmente que estaba suspendido por supuestamente haber provocado una pelea, pero que, al cuestionarlo, el señor Escudero se retractó y le pidió su versión. Tras ofrecerla, el señor Escudero le indicó que el señor Molina Pérez había renunciado y que el asunto quedaba concluido. Galán Nieves manifestó que continuó trabajando ese fin de semana y que al regresar el martes observó al señor Molina Pérez laborando nuevamente, por lo que acudió al señor Rosas, quien dijo desconocer la situación. Señaló que luego se reunieron con el señor Escudero, quien reiteró que el señor Molina Pérez debió haber renunciado, y que en ese momento intervino el Sr. Carlos Vaillant, informándole que no podía permitir que él agrediera a un empleado y que quedaba suspendido.

31. Del informe y la hoja de entrevista se desprende que la señora Ramos, asesora de servicio desde alrededor de 2008, explicó que el señor Molina Pérez es uno de los mecánicos asignados a su equipo y que la semana previa trabajaba en un Jeep que requería varios días porque estaba completamente desarmado. Indicó que el señor Molina Pérez le informó por qué dejó esa unidad en el pino y ella le dijo que

la dejara allí, pues era complicado moverla y había otros pinos disponibles. Ese día también había un trabajo urgente de transmisión que ella le asignó. Más tarde, el señor Molina Pérez le comentó que renunciaría porque no soportaba la actitud del señor Galán Nieves. La señora Ramos relató que al llegar al área de trabajo vio al señor Galán Nieves con talonarios en la mano, hablando en voz alta; ambos empleados se acercaron, se acusaron mutuamente de mentirosos y observó que el señor Galán Nieves empujó al señor Molina Pérez con los talonarios, a lo que este retrocedió y mencionó las cámaras. Según la señora Ramos, Galán Nieves respondió que esas cámaras eran "para gente como él". Ella le indicó al señor Molina Pérez que fuera donde Tomás Rosas, y así lo hizo. Añadió que anteriormente había presenciado maltrato verbal de Galán hacia empleados, incluyendo mecánicos jóvenes.

32. Del informe y la hoja de entrevista se desprende que el Sr. Rafael Palermo, Asesor de Servicio por 22 años, declaró que durante el incidente vio a la señora Ramos entre el señor Molina Pérez y el señor Galán Nieves, y escuchó al señor Molina Pérez decirle al Apelante que no lo tocara, mientras observó al señor Galán Nieves golpearlo con los talonarios en el pecho. También relató que, dos meses antes, escuchó al señor Galán Nieves presionar a un mecánico para que completara un trabajo, presuntamente de un amigo suyo, pese a que el empleado tenía tareas previas, advirtiéndole que lo despediría. Finalmente, señaló que el comportamiento del señor Galán Nieves hacia los empleados depende de cómo llegue al trabajo cada día.

33. Del informe y la hoja de entrevista se desprende que el señor Rosas, empleado de la empresa por treinta años y gerente de piezas y servicio, relató que el día del incidente el señor Molina Pérez llegó a su oficina muy alterado, indicando que no podía seguir trabajando con el señor Galán Nieves porque éste le faltó el respeto y lo tocó. Para evitar que la situación escalara, el señor Rosas le indicó que se fuera a su casa. Luego acudió junto al gerente general, el señor Escudero, a revisar las cámaras, pero el área del suceso no era visible, por lo que consultaron con la gerente de Recursos Humanos, la señora López, y decidieron iniciar una investigación. Explicó que alrededor de las 4:00 p.m., el señor Galán Nieves fue llamado a la oficina de Escudero y allí expuso su versión, tras lo cual se determinó su suspensión. Añadió que el señor Galán Nieves ha mostrado falta de compromiso, problemas de puntualidad y descuido en sus funciones, como el entrenamiento y asistencia técnica, además de generar conflictos entre empleados. Señaló, además, que ha recibido comentarios y quejas sobre su comportamiento, aunque sus intentos de corregir la situación no han tenido resultado.

34. Del informe y la hoja de entrevista se desprende que el señor Escudero, gerente general de la empresa, indicó que no presenció el incidente entre el señor Galán Nieves y el señor Molina Pérez, pero intervino cuando el señor Rosas le informó que el señor Molina Pérez había acudido a su oficina alegando que no soportaba más el trato del Apelante y que éste lo había golpeado con unos papeles. Señaló que revisó las cámaras, aunque las columnas del taller impedían ver el área del suceso. Luego confrontó al señor Galán Nieves, quien negó la agresión, y consultó con la gerente de Recursos Humanos, la señora López, quien recomendó iniciar una

investigación. Explicó que al día siguiente habló con el señor Molina Pérez, lo citó a su oficina y escuchó su versión, corroborada por otras personas, y asumió que había renunciado porque retiró sus pertenencias. Sin embargo, cuando el señor Molina Pérez regresó a trabajar el 30 de enero, el Apelante acudió alterado a cuestionar por qué estaba allí; en ese momento, Carly Vaillant entró a la oficina y afirmó tener testigos de que el señor Galán Nieves había empujado al señor Molina Nieves, por lo que el señor Escudero dispuso su suspensión mientras durara la investigación. Añadió que, en su opinión, el Apelante no es un buen colaborador, trata mal al personal, muestra poca cooperación y compromiso, y la empresa debió haber prescindido de sus servicios hace tiempo.

35. Del informe y la hoja de entrevista se desprende que el Sr. Carlos A. Román, técnico con unos catorce años en la empresa, indicó que ha tenido varios incidentes con el Apelante, aunque ha evitado que escalen por proteger su empleo. Señaló que el señor Galán Nieves posee gran conocimiento técnico, pero ya no lo aplica como antes y, en ocasiones, pierde el control. Relató que unos tres años y medio atrás el Apelante le habló de forma violenta en la oficina de registros de entrada y salida, llamándolo con insultos, lo que provocó la intervención del señor Rosas Rosas y la suspensión del Apelante por alrededor de una semana; mencionó que después ocurrieron otros incidentes. También expresó que cuando el Apelante no está, él consulta al señor Rosas, pero que el señor Galán Nieves se molesta si pide ayuda a otro compañero, diciéndole a ese empleado que no debe hacer trabajos que no le corresponden. Finalmente, opinó que el Apelante es inteligente, pero su actitud varía y genera tensión en el ambiente de trabajo, y que todo mejoraría si fortaleciera sus relaciones interpersonales.

36. Del informe y la hoja de entrevista surge que el Sr. Miguel Ángel Laguerra, quien trabaja en el área de lavado, relató que tuvo un incidente con el Apelante cuando éste le exigió adelantar un vehículo relacionado a un conocido suyo, a pesar de que había otros en turno. Indicó que el señor Galán Nieves lo reprendió de manera autoritaria y le habló en tono molesto, haciéndolo sentir humillado delante de otros empleados. Señaló que informó la situación al señor Rosas y preparó un escrito, aunque desconoce el resultado. Desde entonces, comentó que el Apelante lo trata con indiferencia y lo critica por detalles mínimos. Finalmente, expresó que, en su opinión, el señor Galán Nieves demuestra actitudes de superioridad y mantiene malas relaciones con el personal.

37. Del Informe y la hoja de entrevista se desprende que el Sr. Kervin Vega, técnico automotriz con unos cuatro años en la empresa, indicó que aunque no ha tenido conflictos directos con el Apelante, éste le ha hablado en varias ocasiones con palabras soeces y de forma irrespetuosa, especialmente cuando llega de mal humor. Señaló que el señor Galán Nieves suele regañar a los empleados con comentarios inadecuados y que, en su opinión, no demuestra cualidades de liderazgo, es un supervisor distante, poco colaborador y con un trato pesado y temperamental, lo que considera inapropiado para alguien a cargo de un taller con tantos empleados. Sobre el señor Molina Pérez, expresó que lo conoce del trabajo, que nunca ha mostrado conductas

violentas y que siempre ha sido colaborador y dispuesto a ayudar a sus compañeros.

38. Del informe y la hoja de entrevista se desprende que el Sr. Diego Moreu, mecánico supervisado directamente por el Apelante, relató haber tenido dos experiencias negativas con él. En una ocasión, mientras sacaba un vehículo y frenó, el señor Galán Nieves le gritó insultos en repetidas ocasiones frente a otros empleados y a una persona de una aseguradora, lo cual le resultó muy incómodo, aunque no respondió por tratarse de su jefe. En otra oportunidad, el Apelante lo reprendió de manera irrespetuosa porque, a su juicio, un cristal no había quedado bien limpiado. Manifestó que el trato del Apelante hacia los empleados depende de su estado de ánimo y que, cuando llega molesto, resulta difícil acercársele o hacerle preguntas sin recibir una respuesta áspera.

39. Del informe y la hoja de entrevista se desprende que el Sr. Jorge Vega, técnico automotriz, indicó que ha tenido discusiones con el Apelante y que desde que comenzó a trabajar en la empresa entendió que el señor Galán Nieves era una persona que requería "saber manejarla". Recordó que el día que fue contratado, el Apelante le comentó que haría un "reality" con mecánicos y que, si no daban el grado, serían despedidos. Aunque a él no lo ha insultado directamente, ha escuchado al Apelante usar lenguaje obsceno respecto a otros empleados. Señaló que en ocasiones el señor Galán Nieves no está disponible cuando se le necesita, que puede ausentarse gran parte del día y aparecer tarde para comenzar tareas. Mencionó además que el Apelante controla la producción de los técnicos y puede afectar su reporte. Aunque reconoció que el señor Galán Nieves es capaz y talentoso, opinó que su manera de dirigirse al personal es inadecuada y que suele favorecer a personas cercanas, incluso pidiendo que se atiendan asuntos de amigos o familiares por encima del trabajo asignado.

40. Del informe y la hoja de entrevista se desprende que el Sr. Paul Delgado, técnico automotriz con veinte años en la empresa, describió al Apelante como una persona temperamental cuyo ánimo varía significativamente y con quien ha tenido que manejarse con cautela para evitar conflictos. Señaló que el señor Galán Nieves suele dirigirse a los empleados de manera inapropiada, llamándoles la atención frente a otros y usando lenguaje ofensivo. Añadió que cuando el Apelante está presente el ambiente laboral se torna tenso, se pierde motivación y resulta difícil pedirle ayuda, pues suele responder de forma acusatoria o tarda en asistir, por lo que considera que el taller funciona mejor cuando él no está.

41. Del informe y la hoja de entrevista se desprende que el señor Francisco Ruiz Velázquez, técnico automotriz recientemente nombrado *Team Leader* del área de Quick Lube, indicó que se encontraba cerca del lugar del incidente entre el Apelante y el señor Molina Pérez, que escuchó al señor Galán Nieves hablar en voz alta y vio al señor Molina Pérez retirarse y luego regresar, momento en que lo llamó mentiroso, lo que aumentó la tensión. Señaló que nunca ha tenido problemas con el señor Molina Pérez, a quien describió como una persona tranquila. En cuanto al Apelante, expresó que desde que llegó a la empresa ha tenido roces con la mayoría de los

empleados, que muestra comportamientos difíciles y en ocasiones da trato preferencial a amistades o allegados. Añadió que considera que el señor Galán Nieves afronta situaciones personales que afectan su trato hacia el personal y que su estilo de supervisión crea un ambiente laboral preocupante para los empleados.

42. Del informe y la hoja de entrevista se desprende que el Sr. Luar Santiago, técnico automotriz por dieciocho años, indicó que el Apelante le ha dirigido palabras ofensivas en alguna ocasión y que también lo ha escuchado hacerlo con otros compañeros. Manifestó que el comportamiento del Apelante varía: algunos días está tranquilo y otros tarda mucho en atender los problemas que los técnicos le plantean, aunque en ocasiones responde rápido; estimó que su nivel de ayuda es inconsistente. Agregó que el Apelante suele ser flexible con horarios. Sobre el señor Molina Pérez, expresó que lo conoce del taller, que no es una persona altanera ni conflictiva, que es mayor que muchos de los demás técnicos y que, cuando tiene dudas, las consulta como cualquier otro empleado.

43. Del informe y la hoja de entrevista se desprende que el Sr. Eliezer Rivera, técnico automotriz por unos quince años, conoce al Apelante desde que éste también era técnico y lo describe como una persona de carácter fuerte y temperamental, con quien ha tenido encontronazos. Explicó que para evitar conflictos lo trata estrictamente como a un supervisor y no como compañero, aunque reconoce que en ocasiones el señor Galán Nieves le ha ayudado con asuntos laborales y personales. Señaló que ha visto al Apelante dirigirse a otros empleados con palabras soeces y gestos ofensivos, especialmente hacia compañeros tranquilos que no se atreven a responder, por lo que él prefiere mantener distancia para evitar situaciones similares. Sobre el señor Molina Pérez, indicó que lo conoció en el trabajo y lo considera una persona callada, enfocada en sus tareas y siempre dispuesta a ayudar cuando se le solicita.

44. Del informe y la hoja de entrevista se desprende que el Sr. Jedrick Santiago, técnico automotriz con alrededor de un año en la empresa, relató que en una ocasión pidió al Apelante cambiar su día libre para asistir a la boda de su hermano y que el señor Galán Nieves le respondió que no fuera. Indicó además que mientras trabajaba en el *Quick Lube*, el Apelante le alzaba la voz y no lo dejaba expresarse, y que incluso se burló de un compañero por una condición física en su mano. Añadió que cuando recibió su primer salario, el Apelante le dijo que debía comprar cervezas para todos como "regla" del taller y que se molestó cuando él se negó. Mencionó también que en el taller circulan comentarios sobre un incidente previo en el que el Apelante le sacó un arma a un empleado y no paso nada con la actuación de este. Sobre el señor Molina Pérez manifestó que lo conoce del trabajo, que es servicial y que acude a ayudar a otros sin demora, a diferencia de Apelante, quien no siempre está disponible y no trata a todos por igual.

45. Del informe y la hoja de entrevista se desprende que el Sr. Jorge L. Díaz Roura, técnico automotriz con alrededor de tres años en la empresa, describió al Apelante como una persona de actitud negativa a quien le incomoda que los mecánicos se ayuden entre sí y que, aunque exige obediencia, no está

disponible cuando se le necesita. Señaló que el señor Galán Nieves suele humillar y tratar mal a los empleados, que desalienta que consulten a otros compañeros y que, si acuden a un supervisor superior, se molesta. Agregó que el Apelante controla la producción y, si tiene algún conflicto con un empleado, puede restarle horas, lo que afecta su rendimiento. Indicó además que el ambiente laboral es muy tenso cuando el señor Galán Nieves está presente y que en ocasiones lo ha llamado en su día libre para hacerle reclamos, exponiéndolo incluso en altavoz. Expresó que el Apelante tiende a tergiversar situaciones ante la gerencia y su comportamiento genera un ambiente dañino para el personal.

46. Con relación al testimonio de la Sra. Stacey Nicole Figueroa durante la investigación, surge del informe y de la hoja de entrevista que, ésta ha trabajado para la empresa hace ocho meses en el área de servicio, ha escuchado al Apelante referirse a los técnicos automotrices de 'cabrón', gritarles y tratarlos mal. Agregó que el señor Galán Nieves exige prioridad para que se atienda lo de él primero, aunque haya casos haciendo turno antes.

47. Con relación al testimonio del Sr. Hilton Augusto durante la investigación, surge del informe y de la hoja de entrevista que, éste ha tenido experiencias desagradables con el señor Galán Nieves que ha podido manejar, que este es fuerte de carácter y en ocasiones, aunque no tenga la razón se trata de imponer y que en su presencia ha maltratado de palabra a algunos empleados utilizando palabras soeces.

48. Del informe y la hoja de entrevista se desprende que el Sr. Irving Echevarría ha escuchado al Apelante usar lenguaje obsceno en el taller y negarse a ayudar a los técnicos cuando tienen dificultades, diciéndoles que él no tiene que asistirlos porque es el jefe, además de llamarlos con palabras ofensivas.

49. El Sr. Dan E. Ortiz, técnico automotriz por siete meses y testigo del incidente desde la distancia, indicó que en ocasiones previas el Apelante lo llevó a la oficina para discutir asuntos sin permitirle expresarse, y que suele dirigirse a los empleados en tono alto, limitando que puedan dar su versión. Respecto al señor Molina Pérez, lo describe como un compañero serio, tranquilo y respetuoso.

50. El Sr. Renán Pagán, quien opera el *shuttle* y la grúa del concesionario, señaló que hace unos cuatro años tuvo problemas con el Apelante debido a su falta de tacto y que posteriormente enfrentó dos situaciones adicionales, llegando en la última a presentar una queja formal ante señora López.

51. La Lcda. Santana concluyó en su informe que la evidencia demuestra que el 26 de enero de 2024, el señor Galán Nieves actuó de manera hostil y tuvo contacto físico indebido con el señor Efrén Molina Pérez.

52. La Lcda. Santana determinó que existe un patrón reiterado de acoso laboral por parte del Apelante hacia sus supervisados.

53. Según la Lcda. Santana, las más de cuarenta entrevistas realizadas revelaron que la mayoría de los empleados describió un trato ofensivo, uso constante de lenguaje soez, falta de disponibilidad, ausencias prolongadas y un temperamento que afecta negativamente el ambiente laboral.

54. La Lcda. Santana concluyó además que el Apelante incumple funciones esenciales de supervisión, no promueve el desarrollo profesional del personal y provoca conflictos internos.

55. En su análisis final, la Lcda. Santana determinó que la conducta del señor Galán Nieves constituye acoso laboral y expone a la empresa a riesgos legales, por lo que recomendó que se adopten medidas inmediatas para garantizar un ambiente libre de hostigamiento.

56. El 28 de octubre de 2008, el Apelante fue suspendido de empleo por una situación en la cual el querellante provocó que un empleado lo invitara a pelear con un comentario que le hizo.

57. El señor Galán Nieves fue advertido que ese tipo de situación no se le puede permitir a los empleados y que nadie en la empresa puede faltar el respeto a nadie.

58. Al Apelante se le advirtió que debía mantener el control de sus empleados con respeto y profesionalismo.

59. Al señor Galán Nieves se le advirtió que no estaba permitido que un supervisor pierda el control y diga comentarios que no sean de trabajo.

60. Al Apelante se le advirtió que debía hacer ajustes de inmediato para que ese tipo de situación no volviera a ocurrir y que no se le iba a tolerar una situación de esa naturaleza nuevamente.

61. El 13 de noviembre de 2012, el señor Galán Nieves recibió una amonestación escrita por empujar a un empleado y dirigirse a éste de manera hostil y utilizan palabras ofensivas.

62. El Apelante admitió que empujó al Sr. Francis Comas.

63. Al señor Galán Nieves se le advirtió, por segunda ocasión, que las faltas de respeto y las agresiones, tanto verbales como físicas, están totalmente prohibidas en la empresa.

64. Al Apelante se le exhortó a recapacitar sobre la situación y a corregir su comportamiento de inmediato y se le advirtió que de volverse a suscitar esta situación tomarán medidas que podrían llegar a suspensión o despido del empleo.

65. La decisión de VPH Motor de despedir al Galán estuvo basada en los hallazgos, conclusiones y recomendaciones del Informe de Investigación.

66. VPH Motor consideró, entre otras cosas, que el querellante violó crasamente las normas, procesos y políticas de VPH, así como sus deberes y responsabilidades, incurriendo en faltas de respeto, agresión física y conducta hostil contra un empleado que supervisaba, además de otra conducta impropia según concluido en la investigación.

67. Esta conducta fue lesiva a los mejores intereses de VPH y al bienestar, salud y seguridad de sus empleados y que esta afectó y puso en riesgo de afectar la seguridad, orden y eficiencia de la operación del negocio y sus empleados.

68. En la decisión del despido, VPH tomó en consideración el historial disciplinario del querellante.

69. VPH Motor no entendió necesario realizar o solicitar que se realizara una grabación de los videos de las cámaras de seguridad ya que las cámaras de seguridad no captaron el evento.

70. El sistema de las cámaras de seguridad del concesionario está configurado para almacenar el pietaje por un periodo de tres (3) semanas y transcurrido ese tiempo, el sistema sobrescribe automáticamente la data más antigua, eliminándola del disco duro de manera permanente.

Establecido lo anterior, nos dirigimos a analizar los señalamientos de error esgrimidos. En resumidas cuentas, el señor Galán Nieves sostiene que VPH Motor utilizó como subterfugio una investigación que no se centró en la presunta agresión. De igual forma, arguye que existe controversia respecto a quién era su patrono. Además, alega que nunca fue amonestado por acoso laboral.

Conforme adelantáramos en los acápites anteriores, en nuestro ordenamiento jurídico procede dictar sentencia sumaria si conforme a la evidencia presentada, no existe controversia real y sustancial en cuanto a hechos esenciales y pertinentes del caso. 32 LPRA, Ap. V, R. 36.3. Un hecho material es aquel que tiene el potencial de impactar el resultado de la reclamación. Oriental Bank v. Caballero García, *supra*, pág. 679. Para ello, el Tribunal debe tener a su disposición todos los hechos necesarios para resolver la controversia. Íd., pág. 678. Esto es, un tribunal no puede disponer de un caso por la vía sumaria cuando existan hechos fundamentales controvertidos. SLG Szendrey-Ramos v. Consejo de Titulares, *supra*, pág. 168.

Tras analizar detenida y comprensivamente los documentos que obran en el expediente, incluyendo la "**Querella Enmendada**", la "**Solicitud de Sentencia Sumaria**, su correspondiente *Oposición,* la *Réplica y* los documentos anejados a dichas mociones, hemos arribado a

la conclusión de que el TPI actuó correctamente al disponer del caso por la vía sumaria. Nos explicamos.

De entrada, es imprescindible recordar que la Ley Núm. 80, *supra*, exige la existencia de justa causa como límite a la facultad patronal de despedir a un empleado contratado por tiempo indeterminado. Jusino et alts. v. Walgreens, *supra*, pag. 571. No obstante lo anterior, tal protección no opera en el vacío, ya que nuestro ordenamiento reconoce el poder de dirección empresarial y permite la terminación cuando la conducta imputada, por su gravedad y su potencial de daño pone en riesgo el orden, la seguridad o la eficiencia que constituyen la normalidad operatoria del establecimiento en cuestión. Feliciano Martes v. Sheraton, *supra*, pag. 369.

De hecho, el Tribunal Supremo de Puerto Rico ha resuelto que **nuestro ordenamiento jurídico no le requiere a un patrono esperara a que un empleado que agredió a un compañero durante horas laborables y en los predios de la empresa, cometa una segunda o tercera amenaza o agresión para que pueda ser cesanteada, conforme a la Ley Núm. 80, *supra*.** Esto porque un patrono no tiene por qué permitir un ambiente de trabajo donde los empleados estén impedidos de trabajar en paz y con la tranquilidad de que no van a ser agredidos ni amenazados por sus compañeros. SLG Torres-Mantundan v. Centro Patología, *supra*, pág. 935.

En este contexto, es menester destacar que el señor Galán Nieves ocupó por más de una década el puesto de jefe de taller de VPH Motor, supervisando directamente a técnicos automotrices y personal de apoyo y asistiendo a los asesores de servicio en la distribución diaria del trabajo. La naturaleza del referido cargo imponía sobre él la obligación de actuar con profesionalismo, autocontrol, respeto y fidelidad a las normas del manual del empleado de la empresa, documento que recibió, leyó y cuyo contenido reconoció entender. En particular, dichas normas de trabajo prohibían expresamente la rudeza, el hostigamiento, las agresiones físicas o verbales, el uso de armas de fuego, la provocación a peleas, el uso de

lenguaje soez y cualquier conducta que comprometiera la seguridad o el orden del taller.

De igual manera, el expediente revela que el Apelante no era ajeno a procesos disciplinarios previos. Esto pues, en 2008 fue suspendido por provocar un altercado que fomentó una confrontación física y en 2012 fue amonestado por empujar e insultar a un compañero. En ambas ocasiones se le advirtió de manera clara e inequívoca que conductas de esa naturaleza no serían toleradas y que repetir dicho comportamiento podría resultar en su terminación. Este historial resulta relevante para el análisis de justa causa, ya que evidencia que el Apelante estaba consciente de las consecuencias de reincidir en conductas contrarias a la normativa de la empresa.

El incidente del 26 de enero de 2024, que motivó la queja del señor Molina Pérez, constituye el hecho **determinante y suficiente** que sustenta la conclusión de justa causa para la terminación del empleo. Específicamente, el señor Molina Pérez (validado por otros empleados de la empresa) describió que el Apelante reaccionó de manera agresiva ante un asunto de asignación de trabajo, lo empujó y lo enfrentó de forma intimidante, incluso provocándolo a pelear. Señaló también sentirse amedrentado debido a que el señor Galán Nieves solía portar un arma y presumir de ella. Dichas afirmaciones no quedaron aisladas. La investigación independiente realizada por la Lcda. Santana corroboró sustancialmente la versión del señor Molina Pérez mediante entrevistas presenciales con cuarenta y un empleados (41), cuyos testimonios fueron recogidos en hojas de entrevista.

De dichas entrevistas surgió un patrón de conducta impropia por parte del Apelante, a saber: (1) uso habitual de lenguaje soez, (2) humillaciones públicas, (3) trato hostil y errático, (4) provocaciones, (5) agresiones, (6) favoritismo hacia allegados, (7) falta de disponibilidad para atender problemas técnicos, (8) intervención mínima en sus funciones de supervisión, e incluso (9) comportamientos que generaban temor genuino entre sus supervisados. En vista de lo anterior, la Lcda. Santana concluyó

manifiestamente que el Apelante incurrió en agresión física y en conducta hostil hacia el señor Molina Pérez y que su comportamiento evidenciaba un patrón reiterado de acoso laboral incompatible con sus funciones como jefe de taller de VPH Motor. Además, cabe resaltar que, tanto el gerente general como el supervisor inmediato coincidieron en que el señor Galán Nieves no mostraba compromiso, mantenía malas relaciones con el personal y generaba tensiones constantes en el taller.

En suma, y conforme al marco jurídico que rige la Ley Núm. 80, *supra*, la decisión de VPH Motor de despedir al Apelante estuvo sustentada en razones objetivas, legítimas y directamente relacionadas con el buen y normal funcionamiento de la compañía. Los eventos que provocaron la presentación de la queja por parte del señor Molina era razón suficiente para despedir al Apelante, por lo que VPH Motor no tenía obligación alguna de brindarle al señor Galán Nieves una nueva oportunidad para rectificar su comportamiento. En otras palabras, no era deber del Apelado esperar a que el señor Galán Nieves cometiera otra agresión para proceder con su terminación. Pretender lo contrario implicaría ignorar tanto la evidencia contundente del expediente como la obligación del patrono de asegurar un ambiente de trabajo seguro y libre de daños y perturbaciones que afecten la normalidad operatoria del establecimiento.

A la luz de lo anterior, somos de la opinión de que el TPI actuó correctamente al disponer del caso sumariamente, pues no existen controversias reales sobre hechos materiales y pertinentes que justifiquen su continuación.

**IV.**

Por los fundamentos que anteceden, los cuales hacemos formar parte integral del presente dictamen, *confirmamos* la *Sentencia* apelada.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones